UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE BANCROFT, JR.,

                Petitioner,                Case Number 2:13-cv-13440
                                                Honorable Gerald E. Rosen

HEIDI WASHINGTON,

                Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND GRANTING PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS

This matter is before the Court on Petitioner George Bancroft's petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. On January 27, 2009, Petitioner was sentenced to mandatory life imprisonment after he was convicted in the Macomb Circuit Court of first degree murder, MICH. COMP. LAWS § 750.316, and commission of a felony with a firearm. MICH. COMP. LAWS § 750.227b. Petitioner asserts that he was denied the effective assistance of counsel when his attorney failed to present testimony from an expert witness that the complainant's death appeared to be a suicide rather than a homicide. The petition will be denied because the Court finds that Petitioner's claim is without merit. The Court will also deny Petitioner a certificate of appealability and permission to proceed on appeal in forma pauperis.

# I. Facts and Procedural History

This Court recites verbatim the lengthy and thorough statement of facts relied upon by the Michigan Court of Appeals, which are presumed to be correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> For 18 years, defendant and Paul Weber had an on-again, off-again intimate relationship. They shared at least one joint account and lived together with Randy Clark, a disabled man they treated like their son. On March 8, 2009, Weber was found in his bed with a gunshot wound to the head. The prosecutor argued that defendant shot Weber in his sleep after Weber discovered that defendant had been making numerous and substantial unauthorized withdrawals from Weber's accounts. In contrast, defendant's theory of the case was that Weber committed suicide because he was depressed about his numerous health issues.
>
> While there were a number of witnesses who testified regarding the financial transactions as well as Weber's state of mind near the time of his death, the focus of much of the testimony was on the physical evidence surrounding the manner of his death. The consensus among the witnesses who investigated Weber's death was that the scene was inconsistent with a suicide. Responding officers found Weber lying in bed, partially on his left-hand side and left-hand back, with his arms crossed on the edge of the blankets. It appeared as if Weber had been sleeping. Officers visually surveyed Weber's body and the surrounding area for a gun but were unable to find one.
>
> As part of the investigation, defendant was transported from the residence he shared with Weber to the Chesterfield Police Department. During the initial interview, defendant stated to Detective Brian Chadwick that he had gone to the casino the night before and returned home between 3:00 a.m. and 3:30 a.m. He denied hearing anything that sounded like a gunshot and described how he only checked on Weber because he had not woken up by 9:30 a.m. According to Chadwick,

defendant became upset when the interview concluded and he learned that he was going to be held for a short time while Weber's death was being investigated. Chadwick explained to defendant that this was also being done for his safety because the gun had not been located. Unprompted, defendant told Chadwick that he had seen the butt of a gun between Weber's crossed arms. Defendant invoked his right to an attorney and questioning ceased.

Chadwick returned to defendant's residence before Weber's body was moved and stood where defendant stated that he had seen a gun. He was unable to see a gun from that vantage point. It was not until Weber's body was moved that a .38 special revolver was found partially under Weber's left arm. His fingers were resting on top of the gun, as opposed to being inside the trigger guard.

Dr. Daniel Spitz, the Macomb/St. Clair County Medical Examiner, ruled the manner of death a homicide. Spitz testified:

> We're dealing with a death that involves a close range gunshot wound of the head. Secondarily, we're dealing with a scene and, and blood evidence that [is] not consistent with this being [a] self-inflicted wound. Specifically, the location of the right arm of this individual doesn't add up as far as a wound that could have been self-inflicted. I would expect complete loss of purposeful movement such that the right arm should have fallen solely to, due to the effects of gravity which would have put the arm to the right side of the body, maybe even hanging off the bed. Secondarily, or thirdly, there is a weapon, a gun, which is completely against what I would expect as far as the location of that weapon if this was a self-inflicted wound.
>
> *       *       *
>
> ... the gun is essentially underneath the left arm. So, not only is the arm in a very inconsistent location if this was a self-inflicted wound, but the gun is, is in an impossible position if this was a self-inflicted wound. There's really no

-3-

way for that gun to be underneath the left arm ... And there's also some evidence at the scene which indicates to me that, there's some blood evidence around the scene which I, I don't have an explanation for other than somebody transferred that blood from this location to other areas in the residence, because certainly this person, this decedent was not in any type of condition to be able to move anywhere around this home and transfer blood from his injury or body to other areas of the residence.

Police officer John Willer did not believe the scene evidenced suicide. "I would expect that the gun would have either fell, fall out his hands at the time he made the shot or had been still wrapped within the knuckle, caught up in his knuckle with his finger around the trigger, possibly." Because shooting a gun is a "violent thing," it was "very rare that you see something just kind of drop to, to a concealed position-type deal."

Detective Jason Dawidowicz testified that "I don't think it was possible for [Weber] to commit suicide in the position he was in." "Typically, you're able to find the hand gun either, in my experience, it's always been either on the bed visible, or it might be, the reason I checked the floor, is the gun has a recoil and a lot of times from the force of shooting the gun, it would knock it out of his hands on the floor ... I've never seen a gun in that position before."

Sean Moticciolo from Macomb's medical examiner's office testified that the scene was "suspicious" because Weber "appeared to be sleeping ... And, I didn't see a gun in ready view, readily available." The gun was found partly under Weber's left arm and "I just wouldn't expect it to fall in that place."

Detective Brett Sojda testified that the position of the gun was "a little odd or, if it's a suicide that is, assuming it's a suicide, I found that to be an odd place for it."

The jury convicted defendant of first-degree premeditated murder and felony-firearm and defendant filed a claim of appeal. We granted defendant's motion to remand for a *Ginther* hearing in order to

-4-

determine whether defendant received the effective assistance of counsel at trial. *People v. Bancroft*, unpublished order of the Court of Appeals, entered February 17, 2011 (Docket No. 297810).

## B. GINTHER HEARING

Defendant argued that he was denied the effective assistance of counsel because trial counsel failed to obtain an expert who would have testified that the physical evidence was consistent with suicide.

## 1. TESTIMONY OF LJUBISA DRAGOVIC

In a previously-submitted affidavit, Oakland County Medical Examiner Ljubisa Dragovic averred that he had reviewed the physical evidence in order to offer an opinion on Weber's cause of death. Dragovic found "no physical evidence to support the determination of homicide as manner of death of Paul Weber. In fact, all the physical evidence supports a self-inflicted gunshot wound."

Dragovic was less sure of this opinion at the time of the *Ginther* hearing. He testified that there was "no way of deciding whether the wound had been self-inflicted or inflicted by someone else." Dragovic reviewed Dr. Spitz's testimony, the photographs, the autopsy report, and some of the police reports. Based solely on the physical evidence—the body at the scene, the location of the wound, location of Weber's body and arms, and the location of the weapon—there was no "physical distinction on the basis of these physical findings whether this is a suicide or a homicide. Because ... it fulfills everything for a suicide, but it fulfills also everything—or almost everything for a staged suicide." Dragovic admitted that at the time he signed his affidavit, he was not fully aware of the other circumstantial evidence, including defendant's confession, which was not referenced to at trial.

Dragovic explained:

> As a medical examiner, you come to a conclusion—first of all, the first principle of death investigation by firearm is it is a homicide until proven otherwise. The second principle

-5-

is that you look at the totality of the findings and you make a determination of a—of the—the category of the manner of death based on your investigation. And I fully agree with your autopsy where Dr. Spitz classified as a—a homicide. However, the question that was put to me is—what a very specific question by the—by the people from the public defender's office, is there physical evidence that is unquestionably pointing to this being a suicide. And that's what I am—I am talking about. I'm not talking about additional ... information ... in front of the Trier of Fact. You are discussing only the issues that—that you're looking at, not the other information that you may have that brought you to the point of determining that something is a homicide. Of which I would not have any dispute of—as far as the decision-making process of my colleague.

*        *        *

[B]ased on the information and based on the specific issue of questioning the physical evidence that is used as a detriment for something being a suicide versus a homicide, there is no—that fine line in the material that had been presented to me. The fine line comes in what you refer to the police report, the confession, and the—and the explanation there, which—of course, a medical examiner has to take into consideration in determining the manner of death ... [(emphasis added).]

Dragovic concluded that the physical evidence, standing alone, was not "determinant in this case." Where physical evidence supports a finding of either homicide or suicide, other circumstances must be taken into consideration.

The trial court then questioned Dragovic:

Q. So your opinion in this case takes into account all the physical evidence that you were presented with? All the blood evidence?

A. That's correct. All—all the—the information about the

-6-

location of—of things, I took into consideration, and I—I'm not saying on the basis of the physical evidence, you can't make a distinction.

Q. Now, let me just stop you there. So your conclusion is based on all the physical evidence it's indeterminate as between it was a homicide or a suicide, is that true?

A. That's correct.

Q. That's something different than what your affidavit says, though, because your affidavit says "there's no physical evidence to support a determination of homicide, and all the physical evidence supports a self-inflicted gunshot wound." That's something different than indeterminate, wouldn't you agree? Or am I missing—am I missing something? Indetermin[ate] means it could go either way.

A. Yeah, that's right. And that—that's—that is the—the point that I'm trying to make. There is nothing there that—based on what you can tell—that this is a homicide. There is—there is more in keeping of self-inflicted injury just by—by the overall findings *without knowing additional circumstances. And that—that's the point of—of distinction there*. [ (emphasis added).]

## 2. DEFENSE COUNSEL

For his part, defense counsel testified that his strategy was to develop inconsistencies in the witnesses' testimony regarding the crime scene. Counsel explained that, while the witnesses all suspected homicide, they gave different reasons for why. Some witnesses pointed to the position of the gun and others pointed to the position of Weber's body:

Q. [by defense counsel]: And so I take it that part of your strategy was to point out to the jury that despite this seemingly uniform suspicion because there were so many different reasons given for it, they shouldn't put too much

weight on that?

A. That's exactly right. Because what I need, as any defense attorney tries to do, is point out the inconsistencies in the prosecution's case so when they were up there, and if a police officer said I found that the placement of the weapon was indicative to me of suicide as opposed to homicide, then I would say well, was it the placement of the arm or did you find this. And they'd say no, no, no, no. And then the other ones would say it was just the arm, not the gun. So try to magnify that and try to argue that to the jury.

Defense counsel also believed that Dr. Spitz's testimony was unassailable, given his reputation in the community. "My thinking was that the caliber of Dr. Spitz['s] testimony, his CV and—and everything that to find somebody of that caliber to counter that I—I thought would have been prohibitively expensive. And I'm not sure that I would have found somebody and—and so I—I did not present anybody to refute Dr. Spitz's testimony."

Defense counsel was also concerned that calling an expert witness would have opened the door for reference to defendant's confession.

Evidence that defendant confessed to the murder was presented at the first day of defendant's preliminary examination. While defendant had previously invoked his right to counsel, detectives later discovered some bloody clothing in defendant's bedroom and confronted defendant with the new information. Detective Feld testified:

Q. [by prosecutor]. And when you interviewed the Defendant could you please describe to the Court what it was that you did when you spoke to the Defendant?

A. I sat down with him I identified myself I advised him that there was new evidence that we had uncovered after he was initially interviewed by Detective Chadwick. I advised him I just wanted to get his explanation regarding this new

evidence.

Q. And what if anything had the Defendant say [sic] at that time?

A. At that time he said, is it—"Can I have an attorney with me?" I advised him that he could.

Q. And then, what if anything happened after that?

A. I told him he could have an attorney with him but I didn't—I wanted him to appear remorseful, I told him I didn't know how remorseful it would appear if he wanted to have an attorney with him. And then I said, "But, that's fine, I just wanted to tell you about the bloody T-shirt that was found in your bedroom."

Q. And was this the first time that the actual piece of evidence that was found was mentioned to him?

A. Correct.

Q. And what if anything did Defendant do at that point?

A. In question form he, something to the effect of "Bloody clothes?" is what he stated.

Q. To you?

A. Correct.

Q. And what if anything did you do?

A. I said, "Yes," I said, "We found bloody clothes, bloody clothes were found in your bedroom, a white bloody T-shirt and I just wanted—" and I reiterated, "I wanted to—your explanation on that?"

Q. What if anything happened following that?

A. I believe there was a long pause, he appeared very upset.

Q. When you say he appeared very upset what in fact were you seeing the Defendant do?

A. He started to cry, put his head in his hands there was a pause there he was becoming emotional. After a few minutes he requested a cigarette, and said he was willing to talk about it, but he just wanted a cigarette. I said that was fine, I could—well, I had said I would ask a boss, who later found he was okay with it. But I assured him that I was going to read him his *Miranda* Rights again, before we talked again and he said he was okay with that.

After being read his rights, defendant admitted that he shot Weber because he was "hearing voices." Interestingly, when the second day of the preliminary hearing began, the prosecutor asked the court to strike the testimony regarding defendant's confession. On the first day of defendant's trial, the prosecutor reiterated that she would not be using defendant's "*Miranda*—defective" confession during her case-in-chief.

At the *Ginther* hearing, defense counsel testified as to his fear that, although the prosecutor agreed not to use as to the manner of Weber's death could have opened the door to testimony about the confession:

Q. [by the prosecutor]: Is it fair to say that when an expert has to testify all the relevant data has to be provided to them?

A. One hundred percent, absolutely.

Q. And if you were to have met Dr. Dragovic in preparation for the trial—part of the trial—you would have supplied him the confession, correct?

A. Yes, I would have.

-10-

Q. Regardless of how the Court would have ruled on it in or out, that is data that that expert has to review before he can formulate his expert opinion, correct?

A. Absolutely.

Q. Did you and [the prosecutor] have any informal conversations leading up to the trial as to areas of testimony, what she was planning on getting into or what she thought, well, if this door is open, don't forget I might go in that area? Do you remember any of that?

A. You know, to be honest with you, at—at that—I don't remember anything specific, but I—I know the law well enough to know that just because you agree or because the judge disallows something doesn't mean that it can't come in through an alternative means. So you have to be very careful. Nothing that I know is kept out one hundred percent absolute. So you have to be careful about not opening the door or a crevice because than [sic] they would be fully allowed to come in.

*       *       *

Q. Okay. If Dragovic were to testify that in his opinion it's a suicide, do you think it would have been fair for [the prosecutor] to cross-examine on what he used to make that determination?

A. Absolutely.

Q. Would—if that testimony was prevented by Dragovic during trial, would that have opened the door, in your opinion, to [the prosecutor] being able to cross-examine Dragovic on the confession?

A. That was my biggest apprehension.

-11-

*          *          *

> Q. The bottom line, though, sir, you felt that if you would have called an expert in pathology or forensic pathology to go over the possibility of it being a suicide, you would have opened up the door for a *Miranda* defective confession?
>
> A. Absolutely, sir. And also I think almost an expert on anything else because I would have been duty-bound to give them all of the evidence. So almost any expert on any area could possibly be, because I'm sure [the prosecutor] would have said did you see this and were you privy to this, and so—I—very much so with the medical examiner because that's the big question, suicide or homicide. But with any expert that was a big concern.

Because an expert would need to be supplied with all of the relevant information, defense counsel did not consider making a motion in limine to limit the expert's testimony to only the physical evidence; such a motion did not appear to be a "viable" option.

## 3. TRIAL COURT'S FINDINGS

The trial court faulted trial counsel for not obtaining an expert but concluded that defendant was not prejudiced by the omission.

Specifically, the trial court found that "[t]he prosecution's retention of a well-respected expert is not, in itself, a reason for the defense to forego attempting to retain a qualified expert" and that counsel's "uncritical acceptance of a prosecution expert's opinion can hardly be deemed effective advocacy." Additionally, the trial court rejected defense counsel's concerns regarding the expense of procuring an expert, especially in light of the fact that the trial court had previously approved defense counsel's request for $2,000 to retain a "suicide expert" (presumably to testify as to Weber's state of mind and possible depression at the time of his death).

The trial court further found:

> [T]rial counsel's concerns about "opening the door" to
> introduce defendant's confession were completely
> unfounded. MRE 703 provides that "[t]he facts or data in
> the particular case upon which an expert bases an opinion
> or inference shall be in evidence." While an expert may
> testify without first disclosing underlying facts and data, an
> expert witness "may in any event be required to disclose the
> underlying facts or data on cross-examination." MRE 705.
>
> The prosecution has failed to direct the Court's attention to
> any authority which holds a constitutionally invalid
> confession must be disclosed to a forensic pathologist in
> order for the pathologist to render an expert opinion
> concerning the cause of death. On the other hand, the
> evidence upon which an expert's opinion is based must be
> independently admissible. There is no dispute that a
> forensic pathologist might consider evidence in addition to
> the physical evidence at the scene in determining the cause
> of death. However, it does not follow that the pathologist
> should be allowed—much less required—to consider
> otherwise inadmissible evidence in rendering his or her
> expert opinion. Furthermore, even if trial counsel's concern
> regarding the confession had been well founded, this still
> does not excuse his failure to retain an expert and bring an
> appropriate motion in limine. For all of these reasons, the
> Court concludes that trial counsel's performance was
> deficient. [(footnote omitted).]

The trial court concluded that, although counsel was ineffective, there
was no reasonable probability that the results of defendant's trial would
have been different even if defense counsel had secured Dragovic as a
witness. Primarily, the trial court noted that Dragovic's affidavit was
unequivocal that the manner of death was suicide; whereas Dragovic's
testimony at the *Ginther* hearing was equivocal—the physical evidence
equally supported a finding of homicide or suicide. The trial court
concluded that while Dragovic's testimony "might have been somewhat

beneficial to defendant, since the witnesses called by the prosecution opined that the physical evidence [ ] suggested a homicide rather than a suicide ... [g]iven the considerable circumstantial evidence pointing to defendant's guilt, the Court is not convinced that—absent counsel's error—there is a reasonable probability that the jury's verdict would have been different."

*People v. Bancroft*, No. 297810, 2012 WL 3318179, at *1-8 (Mich. Ct. App. Aug. 14, 2012)(footnotes omitted).

Following the denial of relief by the trial court, Petitioner filed a brief in the Michigan Court of Appeals, raising the following claim:

I. Where the prosecution's strongest evidence of guilt in this murder was testimony that depicted the death scene physical evidence as highly suggestive of homicide trial counsel was ineffective for not consulting with and presenting an expert witness who would have testified that the scene looked more like suicide than homicide.

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *Bancroft*, 2012 WL 3318179, at *9.

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claim. The Michigan Supreme Court denied the application because it was not persuaded that the question presented should be reviewed by the Court. *People v. Bancroft*, 825 N.W.2d 61 (Mich. 2013) (table).

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a

-14-

writ of habeas corpus only if he can show that the state court's adjudication of his

claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the

state court arrives at a conclusion opposite to that reached by the Supreme Court on

a question of law or if the state court decides a case differently than the Supreme

Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S.

362, 405-06 (2000). An "unreasonable application" occurs when "a state court

decision unreasonably applies the law of [the Supreme Court] to the facts of a

prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply

because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly." *Id*. at

410-11.

The Supreme Court has explained that "[a] federal court's collateral review of

a state-court decision must be consistent with the respect due state courts in our

federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been

rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

### III. Analysis

Petitioner claims that his trial counsel was ineffective for failing to obtain an expert to testify that the scene of the complainant's death resembled a suicide contrary to the testimony of the prosecution witnesses. The trial court held a hearing on this claim, and an expert testified for the defense that the conditions at the scene did not indicate whether the victim committed suicide or had been shot by another person. Defense counsel testified that he considered retaining an expert witness, but he decided against it because he feared that such expert testimony would open the door

for admission of Petitioner's illegally obtained confession. The trial court rejected the rationale offered by defense counsel because such testimony would not have opened the door, but it found that Petitioner was nevertheless not prejudiced by the failure to present defense expert testimony. The Michigan Court of Appeals found that defense counsel did not perform deficiently because–despite the contrary position of the trial prosecutor–Petitioner's confession might have been legally obtained, and because defense counsel reasonably feared that the presentation of a defense expert would open the door to cross-examination regarding Petitioner's confession. Because the result reached by the state courts was not objectively unreasonable, the claim lacks merit.

To establish that he was denied effective assistance of counsel under federal constitutional standards, Petitioner must satisfy a two-pronged test and overcome the strong presumption that counsel's conduct did not fall below the range of reasonable assistance. The United States Supreme Court set forth a two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 689 (1984). First, Petitioner must show that counsel's performance was deficient by showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. To do so, Petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id*. at 690. Second, Petitioner

must show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. *Id*. In order to show prejudice, Petitioner must show that there is a reasonable probability that, absent his counsel's errors, the result of the proceeding would have been different, and the factfinder would have had a reasonable doubt respecting guilt. *Id*. at 695. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id*. at 694. Counsel's errors must have been so great that they deprived the petitioner of a fair trial. *Id*. at 687.

A reviewing court's scrutiny of defense counsel's performance is highly deferential, and defense counsel is presumed to have rendered adequate assistance by exercising reasonable professional judgment and sound trial strategy. *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), cert. denied, 523 U.S. 1088 (1998). Petitioner must overcome the presumption that the challenged actions might be considered sound trial strategy under the circumstances. *Strickland*, 466 U.S. at 689; *Tucker v. Prelesnik*, 181 F.3d 747, 754 (6th Cir. 1999). "Strategic choices made after investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "Judicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

A convicted defendant making a claim of ineffective assistance must, as an initial matter, identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Strickland*, 466 U.S. at 690 (emphasis added). A criminal defendant is "not entitled to the most canny lawyer available, only an adequate one." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc). Simply alleging that an attorney's performance was inadequate is not enough to warrant relief. "[T]he threshold issue is not whether [Petitioner's] attorney was inadequate; rather it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory." *Id*. at 229 (emphasis in original). "Counsel is only constitutionally ineffective if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *Id*. Surmounting *Strickland's* high bar is never an easy task. *Cullen v. Pinholster*,    U.S.    , 131 S. Ct. 1388, 1408, 179 L. Ed. 2d 557 (2011).

As an initial matter, the parties dispute whether Petitioner's confession was taken in violation of his Fifth Amendment rights. Petitioner asserts that the confession was obtained in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), because he requested counsel before his custodial interrogation. Respondent asserts that the

-20-

confession was legally obtained. Respondent's position at first glance appears to be an odd one because it cuts against his case. Assuming that the confession was legally obtained, then Petitioner's counsel had nothing to lose by presenting the expert testimony because it would not have opened a door to admission of the confession–the door was already open. But here the prosecutor had already represented to the trial court and to defense counsel that it would not introduce Petitioner's confession in its case-in-chief. Defense counsel's concern was not that the prosecutor might seek admission of the confession during its case, but that the prosecutor might reconsider her position during the defense case if an expert was called. This concern was well-founded.

When an individual is in custody, law enforcement officials must warn the subject before interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel, in order to protect the individual's Fifth Amendment privilege against selfincrimination. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); accord *Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994); *United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997). Once having expressed a desire to law enforcement officials to consult an attorney, an accused "is not subject to further interrogation by the authorities until counsel has

been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

The request for counsel must be unambiguous, however, and if the request is not clear or is equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, questioning need not be terminated. *Davis v. United States*, 512 U.S. 452, 459 (1994); *Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000); *Ledbetter v. Edwards*, 35 F.3d 1062, 1069-70 (6th Cir. 1994). It is the fact that an ambiguous statement regarding counsel permits questioning that reasonably gave defense counsel pause and question whether he should give the prosecutor reason to reconsider its position.

The interrogating officer testified that after Petitioner was informed of his rights, Petitioner stated "can I have an attorney with me." The officer then informed Petitioner that if he asked for an attorney, he would not appear remorseful. After hearing about new evidence discovered by the police, Petitioner confessed, indicating that he shot the victim after hearing voices.

Trial counsel's decision to avoid any action that might cause the prosecutor to revisit her stance on the admissibility of the statement was a reasonable one. Courts are divided on whether a statement such as "can I have an attorney with me"

constitutes an unequivocal request to stop questioning and seek legal counsel. Compare *Martin v. Wainwright*, 770 F.2d 918, 924 n. 6 (11th Cir. 1985) (such statements as "Can I have a lawyer?" or "Can't I have a lawyer?" are equivocal invocations of the right to counsel), and *Robinson v. Stegall*, 157 F.Supp.2d 802, 818-19 (E.D. Mich 2001) ("Can I get a lawyer in here right now?" held to be equivocal), with *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005) ("[c]an I have a lawyer?" constitutes unequivocal request for counsel), and *United States v. Hunter*, 708 F.3d 938, 948 (7th Cir. 2013) ("[c]an you call my attorney?" is an unequivocal request for counsel). Thus, there is conflicting authority regarding the proposition that Petitioner's statement was equivocal, and that his confession was admissible. Prior to trial the prosecutor chose not to make an argument for the admissibility of the confession. But defense counsel testified at the hearing that he was concerned that decision was subject to change. And Petitioner presents no argument that the prosecutor was irrevocably bound by her initial decision. Accordingly, defense counsel's decision not to give the prosecutor a reason to reassess that decision was reasonable, if not wise.

Furthermore, even if the confession was taken in violation of *Edwards*, there nevertheless would have been an arguable basis for using it to challenge the basis of the defense expert's opinion. Statements obtained in violation of *Miranda* can be used

-23-

to impeach a witness. *Mincey v. Arizona*, 437 U.S. 385, 398 (1978); *Harris v. New York*, 401 U.S. 222, 224–26 (1971). "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." *Walder v. United States*, 347 U.S. 62, 65 (1954). "The shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon v. Hass*, 420 U.S. 714, 722 (1975).

Of course there is a distinction in this case. The prosecutor would not have been using Petitioner's confession to impeach his contradictory trial testimony–she would be using it to undermine the basis of an expert witness's opinion. It is a significant distinction because in *James v. Illinois*, 493 U.S. 307, 320 (1990), the Court held that it would not expand *Mincey's* exception to encompass the testimony of *all* defense witnesses. The Court found that such an all-encompassing exception would not further the truth-seeking value, and it would undermine the deterrent effect of the exclusionary rule.

The catch is the Supreme Court's used of "all defense witnesses." Some Courts have read that term to mean that the *Mincey* exception cannot be used to allow a

prosecutor to cross-examine every defense witness called with an illegally obtained confession. Other Courts have held that there are at least some defense witnesses that can be cross-examined by using an illegal confession. See *Wilkes v. United States*, 631 A.2d 880, 889 (D.C. 1993) ("We hold that the truth-seeking function of this trial 'was better served by [allowing the defense expert to be cross-examined about the defendant's illegally obtained statements] than the deterrent function would have been by [their] exclusion."), and *Barcheers v. Alameida*, 146 Fed. Appx. 100, 103-104 (9th Cir. 2005).

That is, from defense counsel's perspective at the time, there was a very real chance that the prosecutor would be permitted to use Petitioner's confession in the cross-examination of a defense expert even if it was taken in violation of *Edwards*. Defense counsel therefore faced two potential avenues whereby the prosecutor might have gained admission of Petitioner's confession. First, the prosecutor might have convinced the trial court that Petitioner's statement regarding an attorney was equivocal, and his confession was admissible. And second, the prosecutor might have successfully argued that even if the confession were obtained in violation of *Edwards*, it nonetheless could have been used to challenge the basis for a defense expert's opinion.

While the decision not to rebut the prosecution's opinion testimony with a

defense expert certainly had disadvantages, the decision to avoid admission of Petitioner's confession at all costs cannot be deemed to be an unreasonable one. A confession by a defendant presents perhaps the strongest evidence of guilt. Any reasonably competent defense attorney should do all he can to suppress his client's admission of guilt. Therefore, the decision not to present expert testimony was a reasonable one.

Accordingly, Petitioner has failed to show that he was denied the effective assistance of counsel at trial, or that the state court adjudication of his claim resulted in an unreasonable application of Supreme Court law. The petition will therefore be denied.

## IV. Conclusion

Before Petitioner may appeal this decision, a certificate of appealability ("COA") must issue. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b).  A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id.* at 336-37. Petitioner has not made a substantial showing of the denial of a constitutional right as to his habeas claim. Accordingly, a certificate of appealability is **DENIED**. The Court will, however, grant Petitioner permission to proceed on appeal in forma pauperis.

### V. Order

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that permission to proceed on appeal in forma pauperis is **GRANTED.**


s/Gerald E. Rosen_____
Chief Judge, United States District Court

Dated:  November 20, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 20, 2014, by electronic and/or ordinary mail.

s/Julie Owens_____

-27-

Case Manager, (313) 234-5135